UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:01-cv-01520-MCE-GGH |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER |
| EL DORADO COUNTY, CALIFORNIA; and CITY OF SOUTH LAKE TAHOE, CALIFORNIA, | |
| Defendants. | |
| AND ALL RELATED ACTIONS | |

----oo0oo----

This litigation was filed by the United States in 2001, pursuant to the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, et seq. ("CERCLA"). The government sought to recover response costs to remediate pollution discovered on the site of a former landfill dump. That landfill was located within National Forest Systems lands near Meyers, California.

1

Although the United States Forest Service ("USFS") initially sited, constructed and operated the so-called Meyers landfill, beginning in the mid 1950's it was run under the auspices of the County of El Dorado ("County"). The facility stopped accepting waste in 1971.

After groundwater contamination was discovered at the site in the 1990's, the USFS insisted that the County and several other entities bear responsibility for remediation efforts. The present lawsuit ensued. After years of litigation, the various defendants sued by the USFS began to enter into Partial Consent Decrees in order to resolve the claims asserted against them. The last of those Partial Consent Decrees was entered into with Defendant County in August of 2010. The County now moves to modify that Partial Consent Decree ("PCD") on grounds that the design plans it incorporated, as prepared on behalf of the government, 1) contained numerous inaccuracies and misrepresentations regarding site conditions; 2) were substantially defective and not constructible as drafted; and 3) were not prepared in accordance with the standard of care applicable to professional engineers. As set forth below, the County's Motion will be granted.[1]

///
///
///
///

---

[1] Because oral argument will not be of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

2

**BACKGROUND**

Under the terms of the PCD between the USFS and the County,[2] the County agreed to consolidate the buried waste mass at the former Meyers landfill by capping the area with a synthetic liner. That cap was designed to reduce the potential that rainwater and snowmelt could infiltrate the garbage and leach potential contaminants into the site's groundwater. See Decl. Of Gerri Silva, ¶ 9. This was to be accomplished pursuant to the USFS's so-called "100% Final Remedial Design" (hereinafter "Design"), a plan consisting of detailed design drawings and specifications created by the USFS and its consulting and design firm, the Energy and Environmental Research Group ("ERRG"). According to the County, while it participated in some meetings about the plan as it was being developed, it was not asked to, nor did it prepare, the Design itself. Id. at ¶ 12. To the contrary, the County maintains it had access to the landfill site only under very limited circumstances as permitted by the USFS. The County alleges that access did not include verification of the plans and specifications as contained in the Design. See id. at ¶ 11.

Although the USFS was itself a potentially responsible party for remediation efforts under CERCLA as the owner of the landfill site, the County claims it decided to enter into the PCD after the government threatened to issue a Unilateral Administrative Order ("UAO") mandating cleanup by the County.

---

[2] The PCD was approved by the Court and filed on August 20, 2010 (ECF No. 389).

1  The County explained that issuance of such a UAO would force it
2  to implement the Design with no financial assistance from the
3  government, and could further have resulted in the imposition of
4  additional daily and treble damages.  Id. at ¶ 15.  The County's
5  decision to settle was further motivated by the fact that a UAO
6  could also have prevented the County from obtaining indemnity
7  under its insurance policies, funds the County needed in order to
8  fund any settlement.  Id. at ¶¶ 16, 21.

9       According to the County, it agreed to construct the Design
10 based on bids predicated on the accuracy of the specifications
11 contained in the Design.  Although the winning bid came in at
12 some $3.43 million, once construction began the County contends
13 that serious survey, site investigation and engineering errors
14 within the Design came to light.  As a result of those alleged
15 plan errors, the initially anticipated cost for the project has
16 escalated to some $7.5 million, and after two subsequent
17 redesigns of the plans the County alleges that even more
18 additional costs may be required.

19      The errors within the Design plans were significant.  Due to
20 a surveying error, the elevation of the buried waste to be
21 relocated was significantly lower than reflected in the plans.
22 The County alleges this meant that instead of having to relocate
23 33,900 cubic yards of waste as shown in the Design estimate, in
24 fact approximately 60,000 cubic yards of waste had to be moved.
25 Decl. of Greg Stanton, ¶ 5.
26 ///
27 ///
28 ///

4

Additionally, large amounts of waste were found beyond the parameters depicted in the Design drawings (see Ex. B to Decl. of Bryan A. Stirrat), which also meant that substantially more waste than anticipated had to be excavated and relocated. Stanton Decl., ¶ 6. Further, because of inaccuracies in the depth of the clay layer in the area where the Design called for a French drain to be installed, the County's contractor had to replace an additional 30,000 cubic yards of soil over the drain site. Stanton Decl., ¶ 7.

The cost estimate incorporated within the Design contained calculations of the units of work needed to construct the project. Those calculations were used by the County's contractor to bid the job, and ultimately proved to be grossly understated as a result of the above-described errors, among others. The Design plans as a whole reflected the need to relocate only 33,900 cubic yards of waste. Because some 106,000 cubic tons have currently been moved, the County claims that just the waste removal portion of the required work virtually tripled during construction. See Stanton Decl., ¶ 13. As indicated above, the flaws in the Design documents have already caused the USFS to redesign the project once, and according to the County the government is currently engaged in the second significant design of the remedial design drawings, plans and specifications.

///
///
///
///
///

In seeking relief from the terms of the PCD as presently constituted, the County alleges that the "100% Final Remedial Design Plan", as the name would appear to suggest, expressly represented just what the implementation of the Design entailed, both with respect to the scope and quantity of work to be performed as well as the surface and subsurface conditions present at the landfill.[3]  The County argues that said "Final" Design therefore carried with it an implied warranty that the Design was both free of any major defect and prepared in accordance with the standard of care applicable to professional engineers and surveys.  Because the USFS prepared the Design for use on its own property, and because the County relied on the accuracy of the Design in agreeing to the PCD, the County contends it would be unfair to saddle it with the cost overruns associated with actually constructing the Design.  Consequently, the County asks this Court to rescind or modify the PCF going forward in order to relieve the County of the consequences of the USFS' misrepresentations as set forth in the design.

///
///
///

---

[3] According to the Crawford Declaration submitted in support of this Motion, a Final 100% Design is, according to the standards of the engineering profession, supposed to be constructible and sufficiently refined and detailed to be suitable for bidding.  Crawford Decl., ¶ 11.  Here, the Design's cost estimate expressly represented that it was "considered to be accurate within a range of plus 15% to minus 10%."  Silva Decl., Ex. E.  Here, given the fact that the County's initial bid of $3.43 million has already increased to some $7.5 million and may escalate still further, it appears that the anticipated margin of error was plainly not satisfied.

6

In opposing the County's request, the government does not dispute the inaccuracies contained within the Design plan, as enumerated by the County and discussed above.  Instead, the government contends that because the terms of the PCD obligate the County to perform such additional work as to attain "performance standards" in remediating contaminants present at the site, it is the County that remains responsible for doing whatever work is necessary to construct the Design despite the admitted faults contained within that Design as prepared.

**STANDARD**

Because a consent decree operates as a final judgment between the parties, "it is accompanied by finality as stark as an adjudication after a full trial." W.L. Gore & Associates, Inc., v. C.R. Bard, Inc., 977 F.2d 558, 560 (Fed. Cir. 1992). Particularly since a consent decree is invoked upon "the deliberate choice of the parties, a movant's burden for modification of a consent order is particularly heavy." Id. at 561.

Under the terms of the PCD at issue here the Court retains jurisdiction for the duration of any performance contemplated by the PCD to construe or modify the PCD as "may be necessary or appropriate."  PCD, ¶ 116.  The PCD goes on to state that nothing within it "shall be deemed to alter the Court's power to enforce, supervise, or approve modification to [the PCD]." Id. at ¶ 120.

///

///

1    Federal Rule of Civil Procedure Rule 60(b)(5) authorizes the
2 Court to modify the PCD if the County establishes that "applying
3 it prospectively is no longer equitable. Fed. R. Civ. P.
4 60(b)(5). The movant, here the County, bears the burden of
5 establishing a "significant change either in factual conditions
6 or in law." Rufo v. Inmates of Suffolk County Jail, 502 U.S.
7 367, 384 (1992).
8    Even if the County can make the requisite factual showing of
9 change, as it attempts to do by way of this Motion, the Court
10 should still not necessarily modify the PCD if the events it
11 identified "actually were anticipated at the time it entered into
12 [the] decree." United States v. Asarco Inc., 430 F.3d 972, 979
13 (9th Cir. 2005), quoting Rufo, 502 U.S. at 385.

**ANALYSIS**

17    Where a project owner like the USFS provides detailed design
18 plans and specifications, the government, and not the contracting
19 party (here the County) bears the risk if such plans and
20 specifications are ultimately determined to be deficient.  As
21 the County points out, this theory of implied warranty for design
22 plans and specifications has been recognized for almost a hundred
23 years and stems from the United States Supreme Court's decision
24 in United States v. Spearin, 248 U.S. 132 (1918). In Spearin,
25 the government contracted for construction of a dry dock at its
26 Brooklyn Navy Yard in accordance with detailed plans prepared by
27 the government. A dispute arose concerning additional costs
28 related to alleged defects associated with those plans.

8

The Court upheld a government against the United States and in favor of its contractor, noting that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Id. at 136.

Subsequent decisions following recognize the same principle that such detailed plans carry with them an implied warranty. Blount Bros. Corp. v. United States, 872 F.2d 1003, 1007 (Fed. Cir. 1989); Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987). As the court remarked in Concrete Placing Co. v. United States, 25 Cl. Ct. 369 (1992); "[i]n exchange for the right to direct specifically how a project shall be performed, the government warrants that its directions are not defective." Id. at 375. It is well settled that a contractor is entitled to reimbursement for increased costs due to defective plans and specifications. See, e.g., L.W. Foster Sportwear Co., Inc. v. United States, 405 F.2d 1285, 1290 (Ct. Cl. 1969).

The so-called Spearin doctrine recognizes that if the owner, here the USFS, produces design specifications setting forth in precise detail how the work is to be performed with specifications permitting no deviation, the owner is responsible for defects in those documents. Haehn Mgmt. Co. v. United States, 15 Cl. Ct. 50, 56 (1988); aff'd, 878 F.2d 1445 (Fed Cir. 1989).

///
///
///

1  That scenario contrasts with circumstances where the owner issues
2  only general performance specifications, leaving both the
3  responsibility to prepare a detailed design, and the risk
4  attendant therewith, to a contractor like the County.  See
5  Stuyvesant Dredging, 834 F.2d at 1582.

6       Whether or not the PCD is a detailed design document as
7  opposed to a simple mandate that general performance
8  specifications be reached is the issue on which enforcement of
9  the PCD now turns.  The County points out the Remedial Design
10 itself calls it a 100% Final Design, consists of detailed designs
11 over 800 pages in length, and is certified by both a professional
12 engineer and a professional geologist.  The County further claims
13 that the PCD requires that the Design be followed to the letter.
14 County's Mot., 12:9-16.  Consequently, the County argues that the
15 costs associated with the USFS' defective design must fall
16 squarely on the government's shoulders.

17      The government, on the other hand, states that the document
18 established only performance standards, and that the PCD
19 specifically contemplates that the government can require the
20 County to perform additional work to meet those standards.  In
21 supporting that contention, the government cites paragraph 13 of
22 the PCD, which states in relevant part that the PCD does not
23 constitute "a warranty or representation of any kind by [the
24 government] that compliance with the work requirements... will
25 achieve the Performance Standards" as set forth in the Plan's
26 Record of Decision and Statement of Work.  PCD at ¶ 13.
27 ///
28 ///

The PCD goes on to state that the County's compliance with such standards "does not foreclose the Forest Service from seeking additional work to achieve applicable performance standards." Id.

The Court does not find the government's position to be persuasive in this regard. Although the government may well have the right to demand that additional work be undertaken after completion of the Design itself in order to achieve desired performance standards, that does not affect the County's right to rely on the detailed plans contained in the Design to satisfy its initial obligation. With respect to the Design itself, there can be no question that the plans and specifications fall within Spearin's purview. The government owned the property, developed detailed design specifications approved by its professionals and required that the County adhere to the scope and method of work incorporated in the Design. Unlike the detailed plans and specifications prepared by the USFS and contained within the Design, performance standards simply establish an overall objective and allow the contractor to determine how to meet that objective. Haehn Mgmt. Co. v. United States, 15 Cl. Ct. at 56. For purposes of Spearin, it is clear that the Design at issue here consists of detailed design specifications rather than overall performance objectives.

There can be no question here, given the evidence before the Court, that the USFS Design contained significant errors resulting in substantially increased costs to the County in construction of the Design.

///

Spearin accordingly mandates that at least with regard to completing the initial Design, the government is responsible for additional work occasioned by defects in the Design.

This conclusion does not preclude the government from later seeking, under the terms of the PCD, additional work to satisfy overall performance standards. The possibility that such additional work may be required, however, does not absolve the government of responsibility for errors contained within the Design itself. The fact that additional work may ultimately be required even after the Design is completed, as stipulated in the PCD, does not put the County on notice that the Design plan itself was not constructible as prepared, contained incorrect survey elevations, misrepresented the extent of waste as shown on the plans, or contained misleading information on subsurface conditions. Even the government appears to concede that the data contained within the Design plans may have been "somewhat off the mark." Opp., 1:15. The Court finds that it would be inequitable under the circumstances to assign to the County the responsibility for both those errors and others contained within the USFS Design. Such responsibility must instead be borne by the government, and the PCD has to be modified accordingly.

///
///
///
///
///
///
///

**CONCLUSION**

The County's Motion for Construction, Enforcement, and Modification of Partial Consent Decree (ECF No. 394) is GRANTED. The County's obligation to continue construction of the Design, or any new designs prepared by the USFS for contaminant remediation on the former Meyers landfill site, is suspended pending further order of this Court. The government's liability for additional costs paid by the County to construct the Final 100% Remedial Design, and for any costs incurred by the County in completing said Design in the future, will be determined by separate evidentiary hearing. The parties are directed to meet and confer 1) with respect to any discovery needed in advance of such a hearing; 2) the anticipated length of the hearing itself and whether it should be assigned to a special magistrate for adjudication; and 3) suggested dates for the hearing so that it may be scheduled as soon as reasonably feasible. The parties are ordered to submit that information to the Court, by way of Status Report, not later than ten (10) days following the date this Memorandum and Order is filed.

IT IS SO ORDERED.

Dated: July 8, 2011

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE